Slip Op. 15-57

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS AMERICA, INC., | |
| Plaintiffs, | **PUBLIC** |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Consol. Court No. 13-00098 |
| Defendant. | |

### OPINION

[Motion for judgment on agency record denied; final determination of sales at less than fair value sustained in part.]

Dated: June 12, 2015

Warren E. Connelly, J. David Park, Jarrod M. Goldfeder, and Phyllis L. Derrick, Akin Gump Strauss Hauer & Feld LLP of Washington D.C. for Plaintiffs Samsung Electronics Co., Ltd and Samsung Electronics America, Inc.

Daniel L. Porter, James P. Durling, Christopher A. Dunn, Ross E. Bidlingmaier, and Claudia D. Hartleben, Curtis, Mallet-Prevost, Colt & Mosle of Washington, D.C. for Consolidated Plaintiffs LG Electronics, Inc. and LG Electronics USA, Inc.

Jack A. Levy, Myles S. Getlan, James R. Cannon, Jr. John D. Greenwald, Matthew Frumin, and Thomas M. Beline, Cassidy Levy Kent (USA) LLP of Washington, D.C. for Plaintiff and Defendant-Intervenor Whirlpool Corporation.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC for Defendant United States. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Joanna V. Theiss, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance for the United States Department of Commerce.

Gordon, Judge: This consolidated action involves a U.S. Department of Commerce ("Defendant" or "Commerce") final determination in the less than fair value investigation of large residential washers from the Republic of Korea. Large Residential Washers from the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012) (final determ. LTFV investigation) ("Final Results"); see also Issues and Decision Memorandum for the Antidumping Duty Investigation of Large Residential Washers from the Republic of Korea, A-580-868 (Dep't of Commerce Dec. 26, 2012), available at http://enforcement.trade.gov/frn/summary/korea-south/2012-31104-1.pdf (last visited this date) ("Decision Memorandum"). Before the court are the motions for judgment on the agency record of Plaintiffs Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung"), Consolidated Plaintiffs LG Electronics Inc. and LG Electronics USA, Inc. (collectively, "LG"), and Consolidated Plaintiff Whirlpool Corporation ("Whirlpool"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

This opinion addresses Whirlpool's challenge to the Final Results. See Consol. Pl. Whirlpool's Mot. for J. on the Agency R. 1-50 (Sept. 27, 2013), ECF No. 46 ("Whirlpool Br."); Def.'s Consol. Resp. to Pls.' Mots. for J. on the Agency R. 51-81 (Feb. 14, 2014), ECF No. 62 ("Def. Resp."); Consol. Def.-Intervenors LG Elecs., Inc.'s and LG Elecs. USA, Inc.'s Resp. to Whirlpool Corp.'s Br. in Supp. of its Mot. for J. on the Agency R. 2-15

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

(Mar. 7, 2014), ECF No. 66 ("LG Resp."); Resp. Br. of Samsung Elecs. Co., Ltd. and

Samsung Elecs. Am., Inc., in Opp'n to Whirlpool Corp.'s Rule 56.2 Mot. for J. upon the

Agency R. 1-21 (Mar. 10, 2014), ECF No. 70 ("Samsung Resp."); Reply Br. of Whirlpool

Corp. 1-37 (Apr. 21, 2014), ECF No. 83 ("Whirlpool Reply").

Specifically, Whirlpool challenges (1) Commerce's finding that LG was not affiliated

to its suppliers; (2) Commerce's finding that LG properly reported all its costs; (3)

Commerce's refusal to apply adverse facts available to LG due to LG's rebate reporting;

(4) Commerce's sales-below-cost test; (5) Commerce's refusal to apply adverse facts

available to Samsung due to an affiliated retailer's failure to cooperate; (6) Commerce's

selection of the shipment date rather than the invoice date as the date of sale for certain

Samsung transactions; and (7) Commerce's treatment of Samsung's costs related to an

unforeseen event as direct warranty expenses rather than a different kind of direct

expenses. For the reasons set forth below, the court denies Whirlpool's motion for

judgment on the agency record and sustains the <u>Final Results</u> for each of the issues

challenged by Whirlpool.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless

they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing

agency determinations, findings, or conclusions for substantial evidence, the court

assesses whether the agency action is reasonable given the record as a whole. <u>Nippon</u>

<u>Steel Corp. v. United States</u>, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial

evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2014). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous."). The court first considers whether Congressional intent on the issue is clear. Dupont, 407 F.3d at 1215. When a "court determines Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467

U.S. at 843. Under <u>Chevron</u>'s second prong, the court must defer to Commerce's reasonable construction of the statute. <u>See, e.g.</u>, <u>Eurodif</u>, 555 U.S. at 316; <u>Union Steel v. United States</u>, 713 F.3d 1101, 1106–10 (Fed.Cir.2013).

## II. Discussion

Whirlpool makes seven multipart arguments in opposition to the <u>Final Results</u>.

## A. Exhaustion

As a preliminary matter, Defendant and Samsung both respond that Whirlpool failed to exhaust certain arguments: (1) that Commerce improperly rejected a factual submission and (2) that Samsung was able to compel its affiliate to act on a prior occasion. Whirlpool Br. at 32-36. Defendant and Samsung explain that Whirlpool failed to raise either issue in its administrative case brief. Def. Resp. at 73, 75; Samsung Resp. at 11-14. Defendant also contends that Whirlpool did not raise any of the exceptions to the exhaustion requirement in its opening brief "despite a manifest exhaustion problem." Def. Resp. at 73.

Whirlpool replies that it preserved its rejected submission argument. Whirlpool Reply at 23-26. Whirlpool explains that it twice attempted to submit the relevant arguments and exhibits, and that Commerce twice issued rejection memoranda outlining the agency's reasoning. <u>Id.</u> at 24. Whirlpool cites to <u>Itochu Bldg. Prods. v. United States</u>, 733 F.3d 1140 (Fed. Cir. 2013), a case that, according to Whirlpool, considered and rejected "almost identical" exhaustion arguments to those Defendant and Samsung raise here. Whirlpool Reply at 25. Whirlpool also argues that "the issue of whether Samsung could compel [its affiliated retailer] was squarely before Commerce" because Whirlpool in

its administrative case brief contended that Samsung did not exert "maximum efforts" to compel cooperation. Id. at 22 (quoting Whirlpool Case Brief, 32-42 (Dep't of Commerce Oct. 31, 2012), CD 312[2] ("Whirlpool Admin. Br.")).

The court agrees with Defendant and Samsung that exhaustion is appropriate in these circumstances. When reviewing Commerce's antidumping determinations, the U.S. Court of International Trade is mandated by statute to require exhaustion of administrative remedies "where appropriate." 28 U.S.C. § 2637(d). "This form of non-jurisdictional exhaustion is generally appropriate in the antidumping context because it allows the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review-advancing the twin purposes of protecting administrative agency authority and promoting judicial efficiency." Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1374-75, 452 F.Supp.2d 1344, 1346 (2006) (citing Woodford v. Ngo, 548 U.S. 81, 88-90 (2006)). The court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

An important corollary to the exhaustion of administrative remedies is Commerce's own regulatory requirement that parties raise all issues within their administrative case briefs. 19 C.F.R. § 351.309(c)(2) (2014) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the final determination."); Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008) (parties are

---

[2] "CD" refers to a document contained in the confidential administrative record. "PD" refers to a document contained in the public administrative record.

"procedurally required to raise the[ir] issue before Commerce at the time Commerce [is] addressing the issue"); see also 19 U.S.C. § 1677f(i)(3)(A) ("the administering authority shall include . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties"). This requirement works in tandem with the exhaustion requirement and promotes the same twin purposes of protecting administrative agency authority and promoting judicial efficiency.

Whirlpool had the opportunity during this proceeding to address the rejected submission and the affiliate's past cooperation, but chose not to do so. By declining to argue or develop either issue in its administrative case brief, Whirlpool signaled that both issues no longer merited attention from Commerce. Whirlpool thereby undermined Commerce's ability to analyze both issues in the Decision Memorandum and in turn deprived the court of a fully developed record on the contested issues. Furthermore, Commerce's regulatory requirement that parties raise all issues within their administrative case briefs carries the force of law, and the court cannot simply ignore it. Exhaustion is therefore appropriate here because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency.

The court also notes that Itochu does not apply here. The U.S. Court of Appeals for the Federal Circuit in Itochu explained that 19 C.F.R. § 351.309(c)(2) did not apply to the voluntary submission made during a changed-circumstances review at issue in that appeal. Itochu, 733 F.3d at 1145 n.1. This action does not involve a changed-circumstances review, but rather a less than fair value investigation to which the

regulation requiring a party to raise all issues in an administrative case brief applies. 19 C.F.R. 351.309(c)(2); Itochu, 733 F.3d at 1145 n.1.

Lastly, Samsung contends that Whirlpool makes an argument in its confidential opening brief about Samsung's invoicing that did not appear in Whirlpool's administrative case brief. Samsung maintains that Whirlpool has therefore failed to exhaust its administrative remedies on this issue. Samsung Resp. at 17-18. Whirlpool does not respond to this argument in its reply brief. Whirlpool Reply at 29-32. Because Whirlpool failed to raise this argument below, the court agrees with Samsung that requiring exhaustion is appropriate in these circumstances as well.

### B. Affiliation Between LG and its Suppliers

Whirlpool challenges Commerce's finding that LG was not affiliated with certain input suppliers. Whirlpool Br. at 11-19; see also Decision Memorandum at 48-51. The statute defines "affiliated persons" as persons that have at least one of a number of relationships, including "[a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(G). The statute further provides that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33). In making the determination of whether "control" exists, Commerce's regulations provide that it will consider inter alia "[c]orporate or family groupings; franchise or joint venture agreements; debt financing;" and critically for this case, "close supplier relationships." 19 C.F.R. § 351.102(b)(3); see also Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 at 838 (1994) (control sufficient to establish affiliation may be demonstrated "for

example, through . . . close supplier relationships") ("SAA"). Not all close supplier relationships are control relationships, however. A close supplier relationship is a control relationship under the statute when "the supplier or buyer becomes reliant upon the other." SAA at 838 (emphasis added).

Despite a comprehensive discussion by Commerce in the Decision Memorandum addressing the issue of affiliation against a well-developed factual record, see Decision Memorandum at 48-51, Whirlpool challenges the issue of affiliation through an elaborate, multi-part argument that the administrative record mandates that LG is affiliated with certain suppliers.

Whirlpool begins with a "legal" challenge. Whirlpool argues that "Commerce plainly adopted a standard of exclusivity as a prerequisite to finding affiliation" that "is not found in the statute or Commerce's regulations and does not reflect a reasonable interpretation of either." Whirlpool Br. at 16, 19. Whirlpool, however, does not apply the Chevron framework to the applicable statutory language. See id. at 16-19. Whirlpool also does not mention or apply the standard of review applicable to Commerce's interpretation of its own regulations. See id.; see also Am. Signature, Inc. v. United States, 598 F.3d 816, 827 (Fed. Cir. 2010) (citing Reizenstein v. Shinseki, 583 F.3d 1331, 1335 (Fed. Cir. 2009)) (explaining standard of review for agency interpretations of its own regulations).

Whirlpool's insistence that Commerce "plainly adopted a standard of exclusivity" is a mischaracterization of the Decision Memorandum and Commerce's collapsing analysis. Rather than "adopt a standard of exclusivity," Commerce simply applied its standard collapsing analysis, crediting as important the specific fact that LG's suppliers did not

exclusively supply LG. This is therefore not a "legal" issue, but instead a more straightforward substantial evidence issue involving the relative weight Commerce accorded "exclusivity" in determining whether LG's suppliers were reliant on LG. See Whirlpool Br. at 15-17 ("Commerce's decision to find that LG and certain input suppliers were not affiliated through a close supplier relationship rested almost entirely on its finding that the suppliers did not exclusively supply LG.").

When framed properly as a substantial evidence issue, Whirlpool's arguments are unavailing. Whirlpool contends that Commerce weighed the duration and terms of the supply agreements and the suppliers' profitability too heavily in its analysis. Whirlpool explains that LG maintained loan agreements with its suppliers that extended over longer terms than the supply agreements, and that the suppliers were profitable because of the loans and other help provided by LG. Whirlpool also argues that "Commerce misunderstood the relevance of LG supplying raw materials for less than market value to its suppliers," insisting that this arrangement "tied the suppliers to LG" suggesting a potential for control. Id. at 18. Whirlpool argues that the record instead supports a finding that LG had the potential to control its suppliers. Specifically, according to Whirlpool, LG: (1) purchased an overwhelming majority of certain suppliers' production; (2) transferred raw materials to suppliers at less than market price; (3) provided no-interest loans to four suppliers and specified how those loans were to be used; (4) provided technical assistance to increase suppliers' productivity; (5) replaced suppliers' old facilities; (6) "partnered" with suppliers "to venture into foreign markets;" and (7) collaborated with

suppliers and met customers together; and engaged in other business proprietary activity with suppliers indicative of an affiliation. Id. at 13-17.

These arguments are ultimately not responsive to the substantial evidence standard of review because they fail to address the whole administrative record. Whirlpool does not account for the record information that detracts from Whirlpool's preferred affiliation outcome. An administrative record for an antidumping investigation may support two or more reasonable, though inconsistent, determinations on a given issue. Whirlpool's argument just emphasizes that portion of the administrative record that supports its preferred outcome. For Whirlpool to prevail on judicial review on fact-intensive issues like control and affiliation, the administrative record must support one and only one determination. In other words, Commerce's conclusion that LG's suppliers were not affiliated with LG would have to have been unreasonable because the overwhelming weight of information and argument on the administrative record demonstrates that they were affiliated with LG.

Here, that was not the case. The issue of affiliation was arguable. Despite the "high level of cooperation and convenience that LG and its suppliers employ in their commercial relationships," Commerce found that "record evidence regarding the suppliers' sales establishes that LG's input suppliers could, and did, look to other unaffiliated buyers of their goods," and reasonably concluded that arrangement "belies the existence of a relationship in which the suppliers have become 'reliant' on LG." Decision Memorandum at 49. Commerce explained that it also considered "(i) the terms and provisions of supply agreements; (ii) the relative percentage that sales to LG represented of each of the

suppliers' total sales; (iii) the terms of any financing agreements with the suppliers; and (iv) the overall profitability of the suppliers." Id. Commerce found that the supply agreements were short-term in nature, were renewable at either party's option, and did not prohibit sellers from selling to other buyers. Commerce also found that no supplier sold exclusively to LG, and that the suppliers were all profitable. Id. at 49-50. Commerce noted that LG does not assume any risk in extending credit to its suppliers because the agreements require the suppliers to post collateral in the form of credit guarantees from commercial banks. Id. at 50. Commerce concluded that LG's suppliers are not reliant on LG, and that therefore, LG's relationship with its suppliers is not a control relationship under the statute.

The information and argument on the administrative record was not so one-sided to require Commerce to find that LG's suppliers were reliant upon LG. The court therefore cannot, on this administrative record, direct Commerce by affirmative injunction to find that LG is affiliated with its suppliers.

On the same issue of affiliation, Whirlpool argues that Commerce erroneously deviated from a past administrative precedent in which it found affiliation. Whirlpool Br. at 15 (citing Certain Welded Stainless Steel Pipe from Taiwan, 62 Fed. Reg. 37,543 (Dep't of Commerce July 14, 1997) (final results admin. review) ("Steel Pipe")). There is a general principle of administrative law that "an agency must either follow its own precedents or explain why it departs from them." See generally, 2 Richard J. Pierce, Administrative Law Treatise § 11.5, at 1037 (5th ed. 2010). Here, rather than arbitrarily deviating from a prior precedent, Commerce reasonably explained that the relationship

at issue in <u>Steel Pipe</u> featured many indicia of control that were not present in this instance. The respondent in <u>Steel Pipe</u> "had full-time access to its supplier's computer system, as well as physical custody of the supplier's signature stamp," and "the supplier pledged its entire inventory and accounts receivable directly to the respondent's bank without any consideration, or even a written agreement." <u>Decision Memorandum</u> at 50-51 (citing <u>Steel Pipe</u>, 62 Fed. Reg. at 37,549-50); <u>see also</u> <u>Steel Pipe</u>, 62 Fed. Reg. at 37,550 (finding control through a close supplier relationship in part because the respondent was the exclusive stainless steel supplier to the alleged affiliate and because there was no evidence the alleged affiliate ever looked elsewhere for stainless steel products). Whirlpool does not address these distinguishing facts. <u>See</u> Whirlpool Br. at 15.

As a final note, Whirlpool raises for the first time a brand new argument on this issue in its reply brief. Whirlpool's opening brief argues that Commerce "ignored" two facts. This argument lacks any basis because Commerce addressed those facts in its <u>Decision Memorandum</u>. <u>Compare</u> Whirlpool Br. at 17 ("Commerce ignored the fact that each supplier's sales to LG accounted for a very substantial proportion of its total sales," and "Commerce ignored that the zero interest loan provided by LG to the suppliers bound [the suppliers] to LG for terms of [numerous] years.") <u>with</u> <u>Decision Memorandum</u> at 49 ("Another factor we considered in our analysis was the relative percentage that sales to LG represented of each of the supplier's total sales," and "we also examined the terms of any financing agreements with the suppliers."). Nevertheless, in its reply brief Whirlpool identifies <u>five</u> additional facts that Commerce supposedly "ignored." Whirlpool Reply at 8-11. Whirlpool may not introduce these new arguments for the first time in its reply. <u>See</u>

SmithKline, 439 F.3d at 1320; see also Scheduling Order at 4 (June 13, 2013), ECF No. 22 ("The reply brief may not introduce new arguments.").

The court therefore sustains Commerce's conclusion that LG is not affiliated to its suppliers through a close supplier relationship.

### C. Unaccounted Costs of Production for LG

Whirlpool argues that Commerce failed to address its argument that LG's cost of production may not reflect certain "costs related to specific sub-assemblies for washers supplied by certain suppliers." Whirlpool Br. at 19. Whirlpool cites record evidence showing that LG provided loans to its suppliers and that LG shared engineers, know-how, and equipment with its suppliers. According to Whirlpool, Commerce "dispatched this important contention with one blithe comment," and that remand is therefore necessary "for further investigation." Id. at 20-21 (citing Decision Memorandum at 51).

Commerce responded to Whirlpool's contention that LG's cost of production did not include certain expenditures by explaining that it "verified that LG had accounted for all appropriate manufacturing, G&A, and financing expenses in its reported costs." Decision Memorandum at 51. "Verification is a spot check and is not intended to be an exhaustive examination of a respondent's business." Monsanto Co. v. United States, 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988); see also Micron Tech v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997); U.S. Steel Group v. United States, 22 CIT 104, 107, 998 F. Supp. 1151, 1154 (1998); PMC Specialties Group Inc. v. United States, 20 CIT 1130, 1134 (1996). Commerce is "not required . . . [to] trace through every number of the response–a representative sample is sufficient." Micron, 117 F.3d at 1396.

Commerce inferred that LG properly reported its financing and technical support costs because Commerce was able to reconcile a representative sample of LG's costs during verification. Although brief, Commerce's explanation provides a reasonably discernable path that addresses Whirlpool's contention. Decision Memorandum at 51; see NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1321-22 (Fed. Cir. 2009) (The court must sustain a determination "'of less than ideal clarity'" where Commerce's decisional path is reasonably discernable. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 281, 286 (1974))).

Whirlpool would have preferred if Commerce had identified direct evidence indicating that LG reported its financing and technical support costs. See Whirlpool Br. at 19-21; Whirlpool Reply at 12-13. Whirlpool does not, however, demonstrate why Commerce's inference that LG did report financing and technical support costs is unreasonable. For example, Whirlpool does not show that the sample Commerce verified was not statistically valid, and Whirlpool does not analyze the adequacy of Commerce's verification procedures. Whirlpool also does not explain why LG should have separately itemized its financing and technical support costs in its responses. See Whirlpool Br. at 19-21; Whirlpool Reply at 12-13. All Whirlpool offers is its own negative inference about the absence of direct evidence. That alone is insufficient to undermine the reasonableness of Commerce's inference from the available record evidence. Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("The question is whether the record adequately

supports the decision of [Commerce], not whether some other inference could reasonably have been drawn."). The court therefore sustains this aspect of the Final Results.

### D. Departure from Past Practice in not Applying AFA to LG

Whirlpool argues that Commerce unreasonably departed from its past practice in not applying partial adverse facts available ("AFA") to LG for LG's reporting of three rebate programs: REBATE1U, REBATE5H, and REBATE4U. Whirlpool Br. at 21-27. Once again, the court is not persuaded.

Commerce uses facts otherwise available under 19 U.S.C. § 1677e when "necessary information is not available on the record" or when "an interested party . . . withholds information that has been requested by [Commerce], . . . fails to provide such information by the deadlines for submission of the information or in the form and manner requested[,] . . . significantly impedes a proceeding[,] . . . or . . . provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a). Commerce "may use an inference that is adverse . . . in selecting from among the facts otherwise available" when an interested party "fails to cooperate by not acting to the best of its ability to comply with a request for information." Id. § 1677e(b).

In Bottom Mount Combination Refrigerator-Freezers from Korea, 77 Fed. Reg. 17,413 (Dep't of Commerce Mar. 26, 2012) ("Refrigerators"), Commerce applied partial AFA to LG because LG failed to disclose its rebate allocation methodology to Commerce's satisfaction and because LG's rebate allocation methodology produced distortions. Issues and Decision Memorandum for the Antidumping Duty Investigation of Bottom Mount Refrigerator Freezers from the Republic of Korea, A-580-865, at 40-49,

59-69 (Dep't of Commerce Mar. 16, 2012), available at http://enforcement.trade.gov/ frn/summary/korea-south/2012-7237-1.pdf (last visited this date) ("Refrigerators Memorandum"). Whirlpool insists that LG's rebate reporting in this investigation is similarly flawed. Commerce discovered at verification that a time lag between the dates of sales eligible for rebates under the REBATE1U program and the dates LG paid those rebates caused underreporting of rebate amounts and revealed the possibility that LG's two-year rebate reporting window was not sufficiently large to capture all rebates applicable to POI sales. Whirlpool Br. at 23-24. Commerce also discovered that LG's records permitted allocation of all rebates under the REBATE5H and REBATE4U programs by time period even though "LG claimed it had 'insufficient information'" to do so. Id. at 24 (quoting LG U.S. Verification Report at 24 (Dep't of Commerce Oct. 16, 2012), PD 446). Whirlpool argues that these deficiencies show that LG knew its methodology would not capture all rebate amounts and would cause distortions, and that LG possessed but did not report information that permitted a more specific rebate allocation. According to Whirlpool, these same problems led Commerce to apply partial AFA to LG in Refrigerators. Id. at 23-26.

In Refrigerators, Commerce found that LG did not act to the best of its ability in reporting its home market "sell-out" rebates" because:

> 1) LG's methodology resulted in rebate amounts which were excessive and not consistent with its commercial activity; 2) LG attempted to mask the unreasonable results of its chosen methodology by capping its reported amounts at 50 percent of gross unit price (rather than requesting guidance from the Department as to an acceptable methodology); and 3) LG failed to disclose its capping methodology in its initial questionnaire response, and

> when it finally disclosed the cap, it only did so as a note in an exhibit
> attached to a supplemental response, rather than in the narrative itself.

Refrigerators Memorandum at 40-41. Commerce in Refrigerators then detailed LG's

many attempts to hide the true nature of its rebate programs and highlighted the

distortions that LG's rebate reporting produced. Id. 41-49. Commerce made similar

findings about other LG rebate programs in Refrigerators:

> After analyzing the facts on the record, we find that LG's methodology for
> calculating [LG's U.S. lump sum and sell-out rebates] was distortive
> because: 1) LG's methodology (before adjustment) resulted in rebates
> ranging from negative amounts to rates significantly exceeding gross unit
> price; and 2) LG's modification to this methodology via an arbitrary cap and
> floor did not make the results more reasonable (but instead only masked
> the distortion). Moreover, we find that LG did not act to the best of its ability
> because it: 1) did not respond fully to the Department's supplemental
> questions; 2) stated inaccurate information in its questionnaire responses;
> 3) did not disclose its methodology until verification; and 4) failed to request
> guidance from the Department as to an acceptable methodology (but rather
> tried to mask what the company itself recognized as unreasonable results
> by spreading what it considered to be excess amounts over other, unrelated
> sales).

Id. at 59; see id. at 59-69.

By contrast, Commerce below recognized LG's "substantial effort" at cooperating

and resolving issues that emerged during verification:

> As an initial matter, we recognize that LG has put forth substantial effort and
> resources to address the rebate reporting deficiencies identified in
> Refrigerators in order to provide a more accurate methodology for reporting
> rebates in this investigation. As LG outlines in its case brief, LG has
> provided substantial information for the record to describe and document its
> rebate reporting methodology. Among other things, LG solicited a meeting
> with Department officials on this topic early in the investigation to seek
> guidance as to how it should reports its rebates. LG submitted extensive
> questionnaire and supplemental questionnaire responses addressing
> rebate reporting, and engaged in a thorough examination of rebate reporting
> during the two sales verifications. Although the petitioner contends that LG's

overall methodology is flawed, it only provided three sets of rebate examples where it identifies specific issues with LG's rebate reporting. As discussed further below, only with respect to one of these sets of rebates do we find cause to adjust LG's reporting. Otherwise, we accept LG's rebate reporting as reasonable and non-distortive.

a) REBATE1U

As the petitioner states, during the CEP sales verification, we identified two issues concerning the reporting of LG's sell-in rebates. We disagree with the petitioner that these issues demonstrate the overall inaccuracy and distortiveness of LG's rebate reporting. Rather, they represent the only significant issues which arose from a thorough examination of LG's methodology. LG fully disclosed its methodology in reporting these rebates in its questionnaire responses, and we obtained the necessary information at verification to revise the reported amounts in a manner we believe is more representative of these rebates. Consequently, we find no basis to conclude that LG's REBATE1U reporting is distortive, nor that LG did not act to the best of its ability in reporting REBATE1U. Thus, there is no basis to apply AFA in adjusting REBATE1U.

. . . .

With respect to the two-year window LG used to reconcile accrual amounts with actual rebate payments, we observed at verification that this methodology may not fully account for volume-based rebates because the window ended at December 31, 2011, and rebate claims for the year 2011 may have continued through 2012. At our request, LG performed an additional analysis at verification and showed that expanding the window for an additional six months captured additional rebate amounts. This revision of LG's methodology, we believe, provides a reasonable means of matching rebates paid after the POI with the sales made during the POI. Accordingly, we have adjusted the reported REBATE1U amounts using the information derived from the additional six-month period, as provided at verification. . . .

b) REBATE5H and REBATE4U

. . . .

The petitioner points to results derived from a detailed examination of specific sales selected at verification, where the Department obtained information that indicated it may have been possible to allocate certain

rebates reported in these categories on a more specific basis. As we noted in our verification reports, LG was able to obtain additional detailed rebate information beyond its electronic records for the relatively small number of sales examined at verification, however, "it did not perform this manual exercise for the thousands of rebate programs applicable to the sales of hundreds of thousands of washing machine units during the POI." Moreover, our examination of other rebate programs reported under these variables supported LG's explanation that a more specific allocation was not possible. Given the extremely large number of sales and rebate programs involved in this investigation, and the time and resource restraints LG faced in meeting the questionnaire response deadlines, along with the fact that LG reported most rebates on a more specific basis, we find LG's REBATE5H and REBATE4U reporting methodology reasonable and, thus, we do not agree with the petitioner that we should find that LG failed to cooperate by not acting to the best of its ability and to apply AFA for these rebates.

Decision Memorandum at 39-41 (footnotes and citations omitted).

As Defendant and LG describe in their responses, see Def. Resp. at 66-70; LG Resp. at 10-15, LG's level of cooperation in Refrigerators differed from its level of cooperation in this investigation. In Refrigerators LG submitted misleading and inaccurate questionnaire responses, hid the full nature of its rebate programs, and refused to seek guidance from the agency in preparing its questionnaire responses. Commerce also found that LG's rebate reporting was distortive. Refrigerators Memorandum at 40-49, 59-69. Here, LG sought guidance from Commerce early in the investigation on how to report rebates. Additionally, LG submitted over 1,000 pages of questionnaire and supplemental responses concerning its rebate reporting, and engaged in a thorough examination of its rebate reporting during both sales verifications. Commerce found that LG "provide[d] a reasonable means" of solving issues with its REBATE1U program at verification by expanding the number of rebates it reported. Decision Memorandum at 40. Commerce

explained that "there is no basis to apply AFA in adjusting REBATE1U" because of LG's cooperation, and accepted LG's REBATE5H and REBATE4U reporting as "reasonable and non-distortive." Id. at 39. Most important, Commerce distinguished the present case from Refrigerators by explaining that LG "put forth substantial effort and resources to address the rebate reporting deficiencies identified in Refrigerators." Id. In the court's view, Commerce provided a reasonable explanation for treating this situation differently than Refrigerators and therefore did not act arbitrarily in refusing to apply partial AFA to LG.

### E. Commerce's Sales Below Cost Test

Whirlpool argues that Commerce's sales-below-cost test violates clear statutory language because it does not account for level of trade. Whirlpool Br. at 5-11. The court is not persuaded. Under 19 U.S.C. § 1677b(b), Commerce may exclude home market sales made at less than the cost of production from its determination of normal value if such sales "have been made within an extended period of time and in substantial quantities." 19 U.S.C. § 1677b(b)(1). Commerce explained below that it "has, over time, developed a consistent, predictable and reasonable practice in this regard to perform the sales-below-cost test and the 'substantial quantities' test on a model specific basis." Decision Memorandum at 43. Under this methodology, if below-cost sales represent 20 percent or more of the volume of sales of a specific model of subject merchandise, Commerce may exclude those below-cost sales. "[A]ll sales of a given model, regardless of [levels of trade], are aggregated for purposes of determining the percentage that were below cost." Decision Memorandum at 41. This approach has been sustained as a

reasonable interpretation of 19 U.S.C. § 1677(b). See Mitsubishi Heavy Indus., Ltd. v. United States, 22 CIT 541, 563-65, 15 F. Supp. 2d 807, 826-28 (1998) (sustaining Commerce's sales-below-cost test as reasonable under Chevron step two), after remand, 23 CIT 326, 54 F. Supp. 2d 1183 (1999), after remand, 24 CIT 275, 97 F. Supp. 2d 1204 (2000), aff'd, 275 F.3d 1056 (Fed. Cir. 2001) (same); NSK Ltd. v. United States, 28 CIT 1535, 1549-53, 346 F. Supp. 2d 1312, 1326-29 (2004), aff'd, 481 F.3d 1355 (Fed. Cir. 2007) (same).

Whirlpool nevertheless challenges this longstanding, court-approved methodology, arguing that the statute requires Commerce to disaggregate home market sales by level of trade before determining whether below-cost sales represent 20 percent or more of the volume of sales of a specific model. Whirlpool Br. at 5-9. By way of example, Whirlpool explains that sales below cost represent more than 20% of LG's sales made at particular levels of trade when considering groups of sales at each level of trade in isolation. Id. at 7-8. Section 1677b(b), though, only requires Commerce to consider whether a respondent made home market sales at less than cost of production "within an extended period of time and in substantial quantities." 19 U.S.C. § 1677b(b)(1). The statute provides no explicit instructions on whether to aggregate sales or not before considering whether they meet those criteria. Id. Moreover, the phrase "level of trade" does not appear alongside "extended period of time and in substantial quantities" or anywhere else in § 1677b(b). Id. The SAA also explains that "the cost test generally will be performed on no wider than a model-specific basis" without any mention of "level of trade." SAA at 832; see also H.R. Rep. No. 571, 93rd Cong., 1st Sess. 71 (1973)

(discussing sales below cost without reference to "level of trade"); S. Rep. No. 1298, 93rd Cong., 2d Sess. 173 (1974) (same). Similarly, the level of trade provision in § 1677b(a) describes how Commerce <u>adjusts</u> normal value "[i]n order to achieve a fair comparison with the export price or constructed export price," without instructing Commerce to alter the set of sales used to calculate normal value. 19 U.S.C. § 1677b(a)(7) (describing requirements for comparing foreign like product sales to U.S. sales by similar levels of trade, but not referencing foreign like product sales made below cost); <u>see also</u> 19 C.F.R. § 351.412(a) (same).

Section 1677b(b)'s references to "sales of foreign like product under consideration for the calculation of normal value" are not clear instructions to group sales by level of trade as Whirlpool claims. 19 U.S.C. § 1677b(b). Rather, as Defendant and LG explain, the statute is silent as to the overlap between level of trade and sales below cost, meaning Congressional intent on this issue is not clear. In the absence of clear Congressional intent on how to resolve the specific issue, Commerce's interpretation governs so long as it is reasonable. <u>See</u> <u>Eurodif</u>, 555 U.S. at 316. Commerce's long-standing sales-below-cost test addresses the statute's explicit "extended period of time and in substantial quantities" criteria as well as the SAA's specification that Commerce conduct the test on no wider than a model-specific basis. Whirlpool identifies a different approach based on level of trade that, in its view, has certain advantages and would have led to a different determination below. Whirlpool, however, fails to demonstrate that its preferred approach is the only correct interpretation of the statute. Whirlpool Br. at 5-9. The court therefore agrees with Defendant and LG that Commerce's established sales-below-cost test, which

does not account for level of trade, must be sustained as a reasonable interpretation of an otherwise silent statutory provision.

Whirlpool argues in the alternative that Commerce's sales-below-cost test is unlawful because it "lacks the power to persuade" under the four factors outlined in Skidmore v. Swift & Co., 323 U.S. 576 (1944), which Whirlpool insists applies here because Commerce describes its sales-below-cost test in an agency manual. Id. at 9-11 (citing Christensen v. Harris County, 529 U.S. 576, 587 (2000)). The court, though, reviews Commerce's statutory interpretations articulated in antidumping proceedings under Chevron. Pesquera Mares Australes Ltda., 266 F.3d 1372, 1382 (Fed. Cir. 2001). Commerce has explained its sales-below-cost test in many antidumping proceedings over the years. See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom, 67 Fed. Reg. 55,780 (Dep't of Commerce Aug. 30, 2002) (final results admin. reviews); see also Mitsubishi Heavy Indus., 22 CIT at 564, 15 F. Supp. 2d at 827 (sustaining Commerce's sales-below-cost test as reasonable under Chevron). It did so again here. See Decision Memorandum at 41-43. Chevron is therefore the appropriate standard of review, not Skidmore.

### F. Samsung's Uncooperative Retailer and AFA

Whirlpool seeks a remand directing Commerce to apply adverse facts available to Samsung. See Whirlpool Br. at 27-31, 35-39. Whirlpool contended during the investigation that Samsung had submitted falsified cost and home market sales data, which to Whirlpool demonstrated "that Samsung had engaged in fraudulent manipulation of its accounting system to systematically falsify its entire accounting system." Decision

Memorandum at 61, 67. Commerce sought information from one of Samsung's affiliated retailers to address Whirlpool's fraud allegation, but the retailer refused to cooperate. Further Discussion of Comments 16-19 in the Issues and Decision Memorandum, 1 (Dep't of Commerce Dec. 18, 2012), CD 324 ("Supplemental Decision Memorandum"). Commerce ultimately "found no evidence of falsified data or fraudulent conduct," and declined to apply total AFA to Samsung despite the affiliated retailer's noncooperation. Decision Memorandum at 67-68, 73.

In essence, Whirlpool argues that Samsung could have compelled its affiliated customer to participate but did not, meaning that Samsung did not cooperate to the best of its ability. Whirlpool contends that the shared family ownership between Samsung and its affiliated retailer positioned Samsung to compel its affiliate to cooperate. Whirlpool Reply at 20; Whirlpool Br. at 35-36. Whirlpool also challenges Commerce's treatment of other facts that weighed on its conclusion. In particular, Whirlpool highlights the affiliate's cooperation during the Refrigerators investigation, and points out that Samsung only used management-level employees to communicate with the affiliate rather than higher-level officers or directors. In Whirlpool's view, Samsung's effort at obtaining its affiliated retailer's cooperation was "half-hearted." Whirlpool Br. at 38.

Whirlpool's argument is unpersuasive on this administrative record. Commerce reasonably found that Samsung demonstrated it could not compel its affiliated retailer to cooperate, and more broadly that Samsung acted to the best of its ability. See Decision Memorandum at 67-72; Supplemental Decision Memorandum at 6-10. Commerce explained that it took numerous special steps in response to Whirlpool's fraud allegation,

including: (1) issuing a supplemental questionnaire on the allegation to Samsung, (2) reviewing Samsung's response and other relevant data, (3) postponing verification of Samsung to ensure Commerce had adequate time to prepare, (4) meeting with Whirlpool's counsel and accounting expert to help Commerce prepare for verification, (5) staffing Commerce's verification with two sales analysts and two consultants, (6) requesting data from the home market customer (who ultimately refused to cooperate), (7) conducting a "surprise" visit to another Samsung home market customer (who did cooperate), (8) using several "surprise" testing methods that Whirlpool's accounting consultant recommended and that Commerce did not disclose to Samsung in advance, and (9) conducting extensive testing of Samsung's accounting system, including the data Whirlpool flagged as indicative of fraud. Decision Memorandum at 67-70. Commerce detailed steps Samsung took to accommodate each of these requests. See id. Further, Commerce described Samsung's "significant efforts" in trying to obtain cooperation from the affiliated retailer. Commerce noted that Samsung contacted its affiliate within one day of Commerce's notification of the need to verify the affiliate's purchase data, and that Samsung communicated with the affiliate about cooperating with the investigation several times. Supplemental Decision Memorandum at 8.

Whirlpool stresses the shared family grouping in arguing that Samsung could compel its affiliate to cooperate. Commerce, though, reasonably found that other evidence on the record softened the relative impact of the shared family grouping. As Commerce explained below, none of the enumerated factors besides "family groupings" applies to Samsung and its affiliated retailer. Samsung and its directors did not have any

significant stock ownership in the affiliated retailer. Samsung and the affiliated retailer shared no corporate board members or managers. Commerce could not find any evidence of intertwined operations between the two companies. Id. at 8. Importantly, Samsung provided documentation of events affecting its relationship with its affiliate[3] undermining Whirlpool's insistence that Samsung could compel its affiliate to act by virtue of the shared family grouping. Id. at 10. Commerce also explained that there was "no evidence that Samsung secured [its affiliate's] cooperation in [Refrigerators] through compulsion" and that "the timing of these events indicates that [the retailer] and Samsung may have been on better terms during [Refrigerators] while their relationship deteriorated to the point that [the retailer] was no longer willing to advance Samsung's interests through its cooperation with [Commerce's] requests." Id. In sum, Commerce found little evidence indicating that Samsung might actually be legally or operationally in a position to exercise restraint or direction over its affiliate. Coupled with the steps Samsung took at Commerce's behest to obtain the retailer's cooperation, Commerce reasonably found that Samsung could not compel its retailer to cooperate.

## G. Date of Sale

During the proceeding Commerce selected shipment date as the date of sale for Samsung's transactions because Commerce determined that the material terms of sale were set by that date. Supplementary Decision Memorandum at 23. Pursuant to

---

[3] "Samsung provided documentation demonstrating that it was involved in   [[

                                        ]]" with its affiliated retailer. Supplemental Decision Memorandum at 10.

regulation Commerce normally uses the date of invoice as the date of sale, but "may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i); <u>see generally</u> <u>Yieh Phui Enter. Co. v. United States</u>, 35 CIT ___, ___, 791 F. Supp. 2d 1319, 1322-24 (2011) (describing in detail Commerce's date of sale regulation). Whirlpool argues that Commerce erred in selecting shipment date rather than invoice date as the date of sale for a particular subset of Samsung's transactions that according to Whirlpool involved changes to material terms <u>after</u> shipment date. Whirlpool Br. at 39-44.

Commerce, though, did not agree with Whirlpool that the underlying <u>agreements</u> between Samsung and its customers materially changed. <u>Supplemental Decision Memorandum</u> at 23-24. Instead, as Commerce reasonably explained, an event occurred[4] during shipment that triggered a conditional item within Samsung's customer agreements, which provided that Samsung would compensate its customers for that particular event. <u>Id.</u> at 23. Commerce explained that Samsung and its customers contemplated the event, and provided for Samsung to make payments to its customers for such an event. To Commerce the changes Whirlpool identifies were therefore not material changes to the underlying sales agreements, but rather the unremarkable result of conditional terms within the sales agreements applying to these particular transactions. <u>Id.</u> at 23-24. There

---

[4] [[                              ]].

is evidentiary support within the record for a reasonable mind to so conclude. The court therefore sustains Commerce's selection of shipment date as the date of sale.

### H. Warranty Expenses

Commerce treated certain Samsung expenses[5] as direct warranty expenses, and as a consequence reduced Samsung's constructed export price. Supplemental Decision Memorandum at 18 (citing 19 U.S.C. § 1677a(d)(1)(B)). In keeping with its past practice, however, Commerce did not reduce Samsung's constructed export price by the full amount of the event expenses. Commerce relies "on a company's three-year average of warranty expenses . . . in place of the [period of investigation] warranty expenses if there is evidence that the [period of investigation] expenses are not representative of a respondent's historical experience, thereby mitigating the impact of warranty claims that may by nature occur at irregular intervals." Issues and Decision Memorandum for the Antidumping Duty Investigation of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the People's Republic of China, A-570-979, at 80 (Dep't of Commerce Oct. 9, 2012), available at http://enforcement.trade.gov/frn/summary/ prc/2012-25580-1.pdf (last visited this date) (citing Wooden Bedroom Furniture from the People's Republic of China, 76 Fed. Reg. 49,729 (Dep't of Commerce Aug. 11, 2011) (final results admin. review); Chlorinated Isocyanurates from Spain, 74 Fed. Reg. 50,774 (Dep't of Commerce Oct. 1, 2009) (final results admin. review)). Whirlpool agrees with

---

[5] [[
      ]], affecting "a significant number of washers." Supplemental Decision Memorandum at 10.

Commerce's decision to reduce Samsung's constructed export price to account for the event expenses. Whirlpool, though, disputes Commerce's treatment of those expenses as warranty expenses and seeks a remand directing Commerce to reduce Samsung's constructed export price by the full amount.

Whirlpool alleges that "Commerce acted contrary to law by re-categorizing these expenses as warranty expenses," believing that Commerce must categorize expenses in accordance with a respondent's accounting system when that system complies with generally accepted accounting principles. See Whirlpool Br. at 47. Whirlpool, however, again does not identify a clear statutory provision that prohibits Commerce from treating the event expenses as warranty expenses or evaluate the reasonableness of Commerce's interpretation under Chevron step two. See id. at 44-50; Whirlpool Reply at 33-37. The court therefore cannot identify a "legal" issue here.

The main thrust of Whirlpool's argument is instead that Commerce unreasonably treated these expenses as warranty expenses (a substantial evidence argument). Whirlpool argues that Samsung maintained a monthly warranty reserve that it used to cover "actual warranty expenses," such as the cost of parts for repair, service fees, and scrapping defective units. Whirlpool Br. at 47-50. Whirlpool further argues that Samsung did not cover the expenses using this warranty reserve, and did not otherwise treat those expenses as warranty expenses in its own accounting system. Id. Whirlpool also argues that certain specific expenses[6] Samsung incurred are more analogous to direct expenses

---

[6] [[                                                       ]] expenses.

that are not direct warranty expenses. Whirlpool contends that these expenses are a direct and unavoidable consequence of specific sales and incident to bringing the subject merchandise from Korea to the place of delivery. Id. at 47. Lastly, although Whirlpool concedes that Commerce has previously treated certain kinds of expenses[7] as warranty expenses in <u>Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the People's Republic of China</u>, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012) (final LTFV determ.) ("<u>Solar Cells</u>"), Whirlpool nevertheless argues that the particular expenses here are distinguishable, and that Samsung did not experience these expenses in "irregular intervals . . . over a three year period." <u>Id.</u>

The court does not agree with Whirlpool. Commerce below explained that it consistently treats expenses like those in <u>Solar Cells</u> as warranty expenses, and reasonably found that Samsung's expenses are similar to those in <u>Solar Cells</u>. <u>Supplemental Decision Memorandum</u>, at 19.[8] Commerce also noted that a typical warranty claim might include expenses similar to those Samsung incurred here.[9] The court is not convinced that the purported differences Whirlpool details in its brief undermine Commerce's reasonable conclusion that Samsung's expenses were similar to warranty expenses. <u>See</u> <u>id.</u> Furthermore, Samsung experienced the event only once during the period of investigation, which reasonably led Commerce to find that the

---

[7] [[                              ]] expenses.

[8] Specifically, Commerce explained that "[[
            ]]." <u>Supplemental Decision Memorandum</u> at 19.

[9] Specifically, expenses associated with [[
            ]].

associated expenses were not representative of Samsung's historical warranty expenses. In the court's view Commerce reasonably calculated a three-year average warranty expenses for Samsung in harmony with past practice. Id. (citing Honey from Argentina, 71 Fed. Reg. 26,333 (Dep't of Commerce May 4, 2006)).

Samsung's treatment of the expenses in its own accounting system may support an alternative calculation of constructed export price, but the court does not agree with Whirlpool that Commerce's treatment is unreasonable merely because of this possibility. Whirlpool's arguments amount to the identification of a potential reasonable alternative finding Commerce could have made on the same facts. In any event, Commerce's treatment of Samsung's expenses was reasonable. The court therefore will sustain this issue.

### III. Conclusion

For the foregoing reasons, the court sustains the Final Results for each of the issues Whirlpool has raised in its motion for judgment on the agency record. Judgment will be entered accordingly.


                                                         /s/ Leo M. Gordon
                                                     Judge Leo M. Gordon


Dated: June 12, 2015
        New York, New York